A03A0743. GUZMAN v. THE STATE.
(580 SE2d 654)

ELDRIDGE, Judge.

A Whitfield County jury found Javier Perez Guzman guilty of burglary, which charge arose when Guzman broke down his neighbors' apartment door and entered their residence in the hopes of acquiring "pills." He appeals, and, in his sole enumeration of error, Guzman contends he received ineffective assistance of counsel at trial because his attorney did not pursue a medical defense to demonstrate Guzman's lack of criminal intent. For the reasons that follow, we find that Guzman's contention has merit, and we reverse his conviction.

---

From the facts of record, it appears that Guzman, an Hispanic resident with limited English, lives with his wife and children two doors away from the victims in the same apartment building. At approximately 10:30 p.m. on the incident date, Guzman knocked on one neighbor's door and asked, "Hey, do you have some pills." That neighbor responded in the affirmative and gave Guzman two Advil. Guzman told the neighbor that the Advil were "too soft" and that he was looking for the "hard ones." The neighbor thought Guzman might be "drunk" because of his eyes and the way he was acting.

Guzman then knocked on another neighbor's door, and no one answered. He moved on to the victims' door; he knocked, and no one answered. He found a rock and used it to force open the door. Guzman entered the residence. The police were called. When the responding officer arrived, he searched the apartment. From under a closed bathroom door, the officer saw a light shining. He knocked on the bathroom door, and Guzman opened it. The officer testified that Guzman appeared "spaced out," "dazed," and his eyes were "glassy looking"; however, Guzman did not appear to be under the influence of drugs or alcohol. His speech was "fine," and he "carried on a conversation" with the officer. Guzman told the officer that he was in the bathroom "looking for some pills." The officer further testified that Guzman was "sweating, you know, profusely" and that there was "a grayish look on his face." Guzman was arrested. Upon his release, he returned to his apartment two doors away from the victims and, apparently, still lives there. No further problems have ensued. Guzman had never been arrested before and had no criminal record.

Guzman was indicted for burglary in that, without permission, he entered his neighbors' residence with the intent to commit a theft. He was appointed counsel. At trial, he defended on the basis of lack of criminal intent. He testified that since 1987 he has suffered from "progressive migraines" that can become so severe that he experiences blackouts; he testified that his symptoms include glassy eyes and that he sweats profusely during such episodes; Guzman testified that he has been to the emergency room because of this medical problem; he stated he was treated in the past by "Dr. Vladan Milosavljevic" in Rome and that a local doctor in Dalton, "Dr. Pederson," first diagnosed his migraine condition and referred him to Milosavljevic. Guzman further testified that he takes "pills" for this condition and has been prescribed Mepergan and Lorcet. Guzman testified that, on the night of the incident, he was suffering from a migraine and must have blacked out:

> Honest to God, like I swear just a little while ago, I can not recollect anything, not even what the officer was saying, that I was talking to him clearly, I do not remember it. I do

not remember it. . . . Whatever they said I must have done it. I'm not saying I didn't do it. I'm not saying that I didn't do it, but I don't know what I done. That's all I can say. I don't know.

He further testified that he believed that he must have been looking for his "pills" when he entered his neighbors' home.

In support of such testimony, defense counsel sought to introduce 25 pages of medical records regarding Guzman's medical condition and his treatments therefor. Counsel attempted to authenticate such records only through testimony from Guzman that he provided the records to the attorney. The State objected and used the opportunity not only to keep the records out, but to negate whatever benefit Guzman might have gained before the jury simply because the medical records exist:

> [Prosecutor:] The records that I've only just been provided and briefly just looked through contains 25 pages filled with hearsay and self-serving hearsay, hearsay from doctors and double hearsay from statements of the defendant here purportedly.

The trial court properly sustained the State's objection on the basis of lack of foundation. Defense counsel asked no more medically related questions, and no witnesses were called on Guzman's behalf.

On cross-examination, the entire gist thereof was to emphasize that no doctor, family member, or friend would testify as to Guzman's medical condition and its symptoms so as to corroborate Guzman's defense:

> [Prosecutor:] So all of these friends and your wife and your doctors could all testify — that you would exhibit those symptoms from your migraine headaches? . . . And do you know whether or not you have them prepared to testify, to tell us that today, witnesses? . . . Do you, do you have witnesses that will corroborate that, that you're sweating profusely and the glassy eyes happens when you get your migraine headaches? . . . They'll be here to testify?
> [Guzman:] No, they're not here.
> [Prosecutor:] Are you aware that you have the same power of subpoena that the state has to have witnesses made to come to court to testify?
> [Guzman:] I never been — this is the first time that I've been on this place.

The jury found Guzman guilty as charged.

Guzman was appointed appellate counsel and a motion for new trial was filed which alleged ineffective assistance of counsel for failure to present medical evidence in support of Guzman's defense. At the hearing thereon and in support of the ineffective assistance of counsel claim, a medical expert, neurologist Dr. Jeffery T. Glass, was called to testify regarding Guzman's medical condition. Glass had reviewed the medical records from Dr. Milosavljevic that trial counsel had attempted to introduce at trial; therein, "[a] real definitive diagnosis was never achieved. It was felt that he [(Guzman)] most likely had confusional migraines." Dr. Glass then examined and evaluated Guzman, taking his history and a neurological survey; giving him a physical; making a diagnosis; and creating a treatment plan. Based upon his review of the medical records and his evaluation of Guzman,[1] Dr. Glass testified that, in his opinion, Guzman most likely suffers from "confusional migraines"; that symptoms of such condition include a "dazed," "spaced-out," trance-like state, such as Guzman displayed on the incident date; that observers may think a person experiencing a confusional migraine is "drunk"; and that profuse sweating can be a symptom of pain associated with migraines. Dr. Glass further testified that it is possible that one experiencing a confusional migraine would be unable to remember what happened in any given instance. Glass specifically testified that persons "definitely don't know right from wrong whenever they're in one of these confusional states."

Guzman's trial attorney was also called to testify as to the ineffective assistance of counsel claim. He testified that, prior to trial, Guzman had given him the medical records from Dr. Milosavljevic that were reviewed by Dr. Glass, which records included the initial determination that Guzman suffered from "confusional migraines." He testified that he did not attempt to interview Milosavljevic nor did he attempt to subpoena records from him or from Hamilton Medical Center in Dalton or MedNow, where Guzman had received treatment "in more recent years." Counsel also testified that Guzman,

> told me concerning this event, this evening, . . . that he was suffering or having a migraine, severe migraine headache. That he left his house, that he didn't have his pills or his medicine, that he left his house and his children were there at the house. His wife was at work so she wasn't home.

---

[1] See OCGA § 24-3-4 (*statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, are admissible*). See also *Turner v. State*, 273 Ga. 340, 344 (541 SE2d 641) (2001) (an expert may give an opinion based upon facts personally observed by the expert and upon data collected by another and personally reviewed by the expert).

And then went into the victims' home and he blacked out and that's about all that I got from Mr. Guzman on his recollection of what happened. . . . That he believed he had passed out. He told me, well, he told me he remembered leaving the house, leaving his house, but after that it was pretty sketchy.

Trial counsel then testified that "[h]earing what Dr. Glass had to say the other day I wish I had subpoenaed or had that doctor here at the trial." Counsel further testified that the physical descriptions witnesses gave of Guzman on the incident date were consistent with "confusional migraines," and "looking back, I think I should have had perhaps at least an explanation for the jury other than this is a guy on drugs, which they may well have taken it to that or felt that that was the reason why he was acting the way he was."

The trial court found that Guzman received effective assistance of counsel at trial. The court concluded that Guzman's attorney's failure to pursue a medical defense by subpoenaing medical evidence and obtaining expert testimony was a "judgment call" grounded in the notion that Guzman had not sought treatment for his migraines since meeting with Dr. Milosavljevic in 1999; thus, as a tactical decision, such failure provided no basis for a finding of ineffective assistance of counsel. In addition, the trial court determined that Guzman's own testimony about his migraine on the incident date permitted the jury "to fully consider any possible mitigating circumstances surrounding the Defendant's mental state during their deliberations." Consequently, the trial court denied Guzman's motion for new trial. *Held*:

The burden of establishing ineffective assistance of counsel is a heavy one. It requires a defendant to establish that counsel's performance fell below an objective standard of reasonableness *and* that a reasonable probability exists that, but for counsel's deficiency, the result of the trial would have been different.[2] This Court never finds easily that the strong presumption that counsel rendered adequate assistance has been overcome, thereby undermining the proper functioning of the adversarial process so that the trial cannot be relied upon as having produced a just result.[3] This case, however, requires such a finding.

Here, as trial counsel stated, Guzman's sole defense was that a migraine headache negated his ability to form the requisite criminal intent. And medical records to substantiate that Guzman has a medical condition relating to migraine headaches and which would corrob-

---

[2] *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SC 2052, 80 LE2d 674) (1984).
[3] Id. at 669.

orate Guzman's testimony were given — pretrial — to defense counsel. Most importantly, the availability and exact substance of favorable expert medical testimony were established at the motion for new trial hearing, *which evidence was procured by appellate counsel upon no more information than that which was possessed pretrial by trial counsel,* i.e., the Milosavljevic medical records. As such, the expert testimony offered at the hearing showed that investigative effort on the part of trial counsel could have procured this favorable evidence on Guzman's behalf at trial.[4] Yet, trial counsel failed to investigate Guzman's medical condition, subpoena records thereon, or seek expert review of the medical records in his possession in order to obtain possible expert testimony at trial. Because Guzman's medical condition was his *only* defense and was fully made known to trial counsel in detail pretrial, and medical records given to counsel pretrial corroborated and supported this defense, counsel had a duty to investigate Guzman's medical condition in order to put forward a medical defense on Guzman's behalf. The *complete* failure to do so was error.

We cannot factually agree with the trial court's conclusion that counsel's failure was a proper "judgment call" because Guzman had not sought treatment for his migraines since 1999. Defense counsel testified at the motion hearing that Guzman gave him his 1999 medical records and also told him he had been treated "in more recent years" at the Hamilton Medical Center in Dalton and at MedNow, but counsel did not investigate the substance of such recent treatments. Accordingly, there was no factual basis for the trial court's finding that "Defendant's lack of ongoing medical treatment since 1999" supported a "judgment call" not to investigate Guzman's medical condition, his sole defense. In that regard, there is no magic in the terms "strategy" or "judgment call" which would preclude a trial court's finding of attorney error when the exercise of such strategy or judgment call is factually insupportable.

Having found attorney error, however, another question remains: Is prejudice established in the record? Under the circumstances presented here, we have no difficulty in finding that it is. The medical evidence showed that Guzman most likely suffers from "confusional migraines" and that individuals "definitely don't know right

---

[4] Because this favorable medical evidence relating to Guzman's sole defense was available to trial counsel based on information he possessed pretrial; because the failure to obtain such evidence was due to counsel's failure to investigate medical information he actually possessed pretrial; and because absolutely no medical evidence was introduced on Guzman's behalf in order to support his sole defense, although it was available to trial counsel pretrial, this Court's evaluation of counsel's representation is not based on "hindsight" but upon counsel's conduct at the time of his representation of Guzman.

from wrong whenever they're in one of these confusional states." To that end,

> A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence.[5]

We emphasize, however, that, in and of itself, the fact that Guzman most likely suffers from "confusional migraines" which could negate criminal intent would not be sufficient to demonstrate prejudice. Of equal importance is credible evidence of records that Guzman was actually experiencing such illness at the time of the incident. Here, testimony from objective eyewitnesses establishes that Guzman could have been experiencing "one of these confusional states" at the time of the incident. From eyewitness testimony, Guzman's physical appearance and actions were consistent with the active symptoms of "confusional migraines"; his inability to remember what happened was consistent with such illness; and his overt, inept, and repeated attempts to acquire "pills" — not crack, coke, or any other drug-related euphemism — were consistent with attempts to obtain his prescribed medication for such illness and the desire to alleviate the pain associated therewith, as was the fact that these attempts occurred only a few doors away from his own apartment. These factors, coupled with evidence that Guzman had no criminal record, no prior problems with his neighbors, and no further problems with them after he returned to the apartment complex, show very little rationale for Guzman's actions other than as a byproduct of his medical condition. Under these circumstances, we conclude that, had the jury been apprised by a neurologist of both Guzman's medical condition which could have prevented him from forming the requisite criminal intent and the active symptoms of such disease which were consistent with Guzman's physical appearance and actions at the time of the incident as established by objective witnesses, there is a reasonable probability that the result of the trial would have been different.[6]

Again, we cannot agree with the trial court's conclusion that Guzman's testimony, alone, permitted the jury "to fully consider any possible mitigating circumstances surrounding the Defendant's mental state during their deliberations." Guzman is not a neurologist

---

[5] OCGA § 16-3-2.

[6] *Strickland v. Washington*, supra at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

and could not testify as a medical expert about the specific symptoms associated with "confusional migraines," especially the effect of such disease on criminal intent. Moreover, the prosecution's sole rebuttal to Guzman's testimony about his migraines was a lack of corroboration that his medical condition even existed. Such argument would have been rendered impossible had favorable medical evidence — *which was proved available to trial counsel pretrial* — been introduced and admitted on Guzman's behalf.[7]

The proper standard of review requires us to accept a trial court's determination that a defendant received effective assistance of counsel unless such finding is clearly erroneous.[8] Because, under the specific facts of this case as outlined above, the trial court's finding that Guzman received effective assistance of counsel was factually and legally unsupportable, we reverse.

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED MARCH 31, 2003.

*Michael A. Corbin*, for appellant.
*Kermit N. McManus, District Attorney, Susan L. Franklin, Assistant District Attorney*, for appellee.

---

[7] By brief, the State argues that the prejudice prong of the *Strickland* test was not established. In support of this contention, the State directs our attention to evidence of record that could serve to show that Guzman was *not* experiencing a confusional migraine at the time of the incident. However, because equally strong (if not stronger) evidence of record as related above could serve to show that Guzman *was* suffering from such migraine at the time of the incident, the State's argument simply raises a genuine conflict issue for jury resolution and does not demonstrate lack of prejudice.

[8] *Smith v. State*, 256 Ga. 483 (351 SE2d 641) (1986).